UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

United States of America

v.                                                    No. 2:09-cr-90-2

William Murray

## REPORT AND RECOMMENDATION
(Docs. 726, 762, 777)

William Murray, proceeding *pro se*, has moved under 28 U.S.C. § 2255 to vacate,

set aside, or correct his sentence.  In 2011, following an 11-day jury trial, Murray was

convicted of knowingly and willfully conspiring with others to distribute heroin and

500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 846.

(Doc. 591 at 1; Doc. 479 at 1–2; Doc. 477 at 1.)  United States District Judge William K.

Sessions III sentenced Murray to 100 months in prison, followed by a four-year term of

supervised release.  (Doc. 591 at 2–3.)  Murray's conviction was affirmed on appeal,

*United States v. Aguiar*, 737 F.3d 251 (2d Cir. 2013) (No. 11–2562–cr(L)), *cert. denied*,

135 S. Ct. 400 (2014), and he is currently serving his sentence (Doc. 726 at 1).

In the instant Motion, Murray claims that Attorney Robert Behrens provided

ineffective assistance of counsel before the district and appellate courts.  (Doc. 726.)

Murray sets forth five main ineffective assistance arguments, which mirror those made by

his codefendant, Stephen Aguiar, in his respective § 2255 motion.  The identical claims

made by Aguiar have been rejected by the Court in their entirety in an Opinion and Order

denying Aguiar's § 2255 motion and numerous related motions. *United States v. Aguiar*, No. 2:09-cr-90-1 (D. Vt. 2009), ECF No. 780 (adopting Report and Recommendation, *id.*, ECF No. 767).

The government filed a Response in Opposition to Murray's Motion. (Doc. 749.) Murray filed a Reply (Doc. 753) and also moved, with Aguiar, to join four motions filed by codefendant Aguiar (Doc. 762). All motions by Aguiar that Murray sought to join were denied by the Court's Opinion and Order on January 23, 2017, *Aguiar*, No. 2:09-cr-90-1, ECF No. 780, and the Motion for Joinder, as to Aguiar, was accordingly denied as moot, *id.*, ECF No. 781.

Attorney Behrens responded to Murray's assertions of ineffective assistance in an Affidavit.[1] (Doc. 779.) Therein, Behrens describes the pretrial motions he filed on behalf of Murray and the motions filed by co-counsel Attorney David Williams that he joined. (*Id.*) In particular, Behrens describes his efforts to challenge the government's use of wiretap and other electronic evidence. (*Id.*)

As discussed below, Murray's claims, replicating Aguiar's, fail for many of the same reasons that the Court addressed in denying Aguiar's § 2255 motion. *See Aguiar*, No. 2:09-cr-90-1, ECF Nos. 767, 780. Accordingly, and for the reasons stated below, Murray's Motion for Joinder (Doc. 762), like Aguiar's, is DENIED as moot, in light of

---

[1] Murray moved to strike the original Affidavit (Doc. 773) on the basis that it was not properly certified, that a copy was not properly served on Murray, and that it contained false statements. (Doc. 777.) Pursuant to an Order by the Court (Doc. 778), Behrens filed an amended Affidavit on January 19, 2017 (Doc. 779) in compliance with 28 U.S.C. § 1746, which requires an affidavit to contain the language "under penalty of perjury," in order to be treated as sworn. 28 U.S.C. § 1746; *see also In re World Trade Ctr. Disaster Site Litig.*, 722 F.3d 483, 488 (2d Cir. 2013). The Court refers to this properly sworn version of the Affidavit. Murray's Motion to Strike is DENIED, as discussed below.

the Court's Opinion and Order dismissing all of Aguiar's motions that Murray seeks to join.  *See Aguiar*, No. 2:09-cr-90-1, ECF Nos. 767, 780, 781.  Murray's Motion to Strike Affidavit (Doc. 777) is also DENIED as both moot and meritless.  Finally, I recommend that the Court DENY Murray's Motion to Vacate (Doc. 726).

## Background

Much of the following background was set forth in this Court's Report and Recommendation, *Aguiar*, No. 2:09-cr-90-1, ECF No. 767, subsequently adopted in an Opinion and Order, *id.,* ECF No. 780, denying Aguiar's § 2255 motion and related motions.  The facts presented here are derived from filings in the extensive pretrial proceedings in this case, the trial and sentencing transcripts, and the U.S. Probation Office's Presentence Investigation Report (PSR).  This summary is not intended to be exhaustive, but rather to include only those facts essential to the pending § 2255 Motion.

## I.      Investigation and Investigative Techniques

In 2008, the Drug Enforcement Administration (DEA), in coordination with the Burlington Police Department, began to investigate a large-scale heroin and cocaine distribution ring operating in the Burlington, Vermont area.  (PSR at 4, ¶ 12; Doc. 613 at 96–97; Doc. 633 at 52–53.)  It was later determined that this distribution ring was organized, led, and managed by Stephen Aguiar.  (PSR at 4, ¶ 12.)  Trial testimony and documentary evidence revealed that Aguiar regularly traveled to Dorchester, Massachusetts to acquire bulk quantities of heroin and cocaine for distribution in Vermont.  (*Id.* at 5, ¶¶ 13–15.)  He distributed these drugs through numerous Burlington-area distributors, including William Murray.  (*Id.* at 4, ¶ 12.)

The interception of wire communications between members of the conspiracy, pursuant to Title III intercept orders,[2] and contemporaneous GPS tracking, were key components of the government's investigation. The Court granted Title III wiretap applications involving cell phones linked to Aguiar on June 3, June 18, July 2,[3] and July 21, 2009. *See In re Tahair*, No. 2:09-mc-34 (D. Vt. 2009), ECF Nos. 8, 14, 18, 20. As discussed below, the July 2 application did not include the complete Department of Justice (DOJ) authorization memorandum required by statute. *See id.*, ECF No. 18; (Doc. 624 at 77); *see also* 18 U.S.C. § 2516(1). The Court also granted multiple government applications to install and use pen register and trap and trace (pen/trap) devices[4] (Doc. 371 at 4–5, 28), including one granted on April 3, 2009 that contained an incorrect phone number. (*Id.* at 26.) The pen/trap orders also authorized the collection of

---

[2] Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (codified at 18 U.S.C. §§ 2510–22) permits the interception of wire, oral, and electronic communications in the investigation of specified offenses. Both the Fourth Amendment and Title III require law enforcement to adhere to certain procedures in the interception of communications and the applications seeking such authorization. *See, e.g.*, 18 U.S.C. § 2516; *United States v. Ambrosio*, 898 F. Supp. 177, 181, 184, 186 (S.D.N.Y. 1995) (discussing various Title III and Fourth Amendment requirements). Documents, including Title III intercept orders, relating to the investigation that led to the indictments of Aguiar and his coconspirators are docketed in a miscellaneous case, *In re Tahair*, No. 2:09-mc-34 (D. Vt. 2009).

[3] This wiretap application was sworn on July 2, but filed on July 6, 2009. *See In re Tahair*, No. 2:09-mc-34, ECF Nos. 17, 18. The application is referred to herein by the July 2 date since the parties refer to it by this date. (*See, e.g.*, Doc. 723-1 at 8; Doc. 737 at 8.)

[4] A pen register is "a device or process which records the telephone numbers of outgoing calls; the trap and trace device captures the telephone numbers of incoming calls. *See* 18 U.S.C. § 3127. Among the most commonly used law enforcement techniques, a pen/trap order authorizes real-time electronic monitoring of a telephone user's calls (excluding content) for a limited duration . . . ." *In re Application for Pen Register & Trap/Trace Device with Cell Site Location Auth.*, 396 F. Supp. 2d 747, 749 (S.D. Tex. 2005) (footnote omitted); *see also* 18 U.S.C. § 3127(3) (defining pen register), (4) (defining trap and trace); *United States v. Lambis*, 15CR734, 2016 WL 3870940, at * 1 (S.D.N.Y. July 12, 2016) ("Pen register information is a record from the service provider of the telephone numbers dialed from a specific phone."). An order authorizing the use of a combined pen register and trap and trace may be referred to as a "hybrid order." (*See* Doc. 371 at 5 n.4.)

cell-site-location data.[5]  (*Id.* at 5 n.4, 28); *see, e.g.*, *In re Tahair*, No. 2:09-mc-34,
ECF Nos. 1, 2; (*see also* Doc. 624 at 13; Doc. 284 at 9; Doc. 625 at 19–20.)

In conjunction with the monitoring of wire communications, law enforcement also
used GPS devices to track the movement of Aguiar's vehicles within Vermont and
Massachusetts, and between the two states.  (*See, e.g.*, Doc. 614 at 108–29, 134–64.)  The
GPS devices were surreptitiously installed on the vehicles and law enforcement did not
obtain search warrants authorizing the installation.  (*See, e.g.*, Doc. 371 at 37–38.)

The government's proof at trial included recorded conversations between the
conspirators and other electronic evidence garnered from these investigative techniques.
The PSR summarized wire intercepts of conversations between Aguiar and Murray
between July 4 and July 23, 2009, concerning cocaine transactions.  (PSR at 7, ¶ 24.)
During trial, the government presented these many digital recordings, including one in
which Aguiar and Murray discussed Murray's heroin distribution and sales.  (Doc. 633
at 202–03 (Tahair testimony deciphering phone call played in court).)

## II.   Preliminary Proceedings and Indictments

On July 29, 2009, Murray was initially charged in a Complaint that alleged he,
Stephen Aguiar, Brian Tahair, Jessica Adcock, Daniel Reyes, Lisa Foy, Jeremy
Mackenzie, Herbert Lawrence, Franklin Grant, and Jason Opalenik engaged in a
conspiracy "among themse[lv]es and others, known and unknown, to knowingly and

---

[5] Cell-site-location data refers to "location-related data, such as cell tower locations and GPS coordinates."  (Doc. 371 at 29.)  This data appears to be different than cell "switch" information, which was gathered in another component of the case.  At trial, Alexis Eon of Verizon Wireless explained: "a switch is what transfers calls back and forth from the cell phone.  And it is cell tower specific."  (Doc. 523 at 211.)

intentionally distribute cocaine and heroin, Schedule I and II controlled substances."
(Doc. 1 at 1.)  Murray was arrested (Doc. 48) following the issuance of a warrant.
Murray did not oppose detention (Doc. 63), and the Court ordered him detained pending
trial (Doc. 67).

On August 13, 2009, the Grand Jury returned an Indictment charging Murray,
Aguiar, and others with multiple violations of the Controlled Substances Act.  (Doc. 86.)
Murray was charged in a series of Superseding Indictments (Docs. 97, 175, 265), and
ultimately the Grand Jury returned a Fourth Superseding Indictment charging Murray in
one count (Doc. 409).  Aguiar was charged in nine counts, together with a forfeiture
allegation.  (*Id.*)  Murray was arraigned and entered a plea of not guilty.  (Doc. 416;
Doc. 613 at 45.)  Murray and codefendants Aguiar and Whitcomb later proceeded to trial
on the Fourth Superseding Indictment.  (Doc. 613.)

Trial was held on a Redacted Fourth Superseding Indictment, which alleged the
following: Count 1 charged Aguiar, Murray, and Whitcomb with conspiring with Tahair,
Grant, Mackenzie, Adcock, Opalenik, Foy, and Reyes to distribute heroin and five
kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and
846 (Doc. 477 at 1); Counts 2 and 3 charged Aguiar and Tahair with distributing cocaine
on two different occasions, in violation of 21 U.S.C. § 841(a)(1) (*id.* at 2, 3); Counts 4, 5,
and 6 charged Aguiar and Mackenzie with distributing cocaine on three different
occasions, in violation of 21 U.S.C. § 841(a)(1) (*id.* at 4, 5, 6); and Count 7 charged
Aguiar with possessing cocaine with the intent to distribute, in violation of 21 U.S.C.
§ 841(a)(1) (*id.* at 7).  Count 8 provided a forfeiture notice that if convicted, Aguiar

would have to forfeit proceeds derived from, and property used or intended to be used in the commission of, the charged offenses under 21 U.S.C. § 853.  (*Id.* at 8.)

## III.    Pretrial Motions

The pretrial proceedings concerning the Title III intercepts and other electronic evidence were complex.  A review of the record reveals that Attorney Behrens argued zealously on Murray's behalf and appropriately raised numerous issues by means of motions to suppress, in a vigorous effort to challenge and suppress the electronic evidence garnered by the government during the investigation.  Behrens also joined in codefendant Aguiar's motions, which are discussed below.

Attorney David Williams, who was appointed to represent Aguiar, filed a Motion to Suppress on March 9, 2010, seeking suppression of the following: (1) any wire communications that were intercepted pursuant to the Title III warrants issued by this Court; (2) evidence discovered pursuant to the April 3, 2009 order that authorized the installation and use of pen/trap devices and required production of "telecommunication records and information"; (3) evidence seized pursuant to a search warrant for Aguiar's Quincy, Massachusetts residence, including cell phones; (4) evidence seized without a search warrant from Aguiar's iPhone following his arrest; and (5) evidence seized through the warrantless GPS tracking of Aguiar's vehicles.  *Aguiar*, No. 2:09-cr-90-1, ECF No. 171 at 1–2.  In the Motion, Williams challenged this evidence on statutory and Fourth Amendment constitutional grounds.  *See id.*  He buttressed his challenges to the evidence with 21 exhibits in an effort to highlight inconsistencies and alleged improprieties committed by the investigators.  *Id.* ECF Nos. 171-1–171-21.

7

On behalf of Murray, Attorney Behrens also filed a Motion to Suppress.  (Doc. 180.)  Behrens sought suppression of "all oral communications intercepted under the authority of [the] Title III warrant issued by this Court on July 2, 2009."  (*Id.* at 1.)  Raising issues previously set forth by Attorney Williams, Behrens asserted that the government: (1) did not have "proper authorization" for the July 2 application (*id.* at 2); (2) "improperly monitored" phone calls before the July 2 authorization (*id.* at 3–4); (3) "failed to demonstrate normal investigative techniques were tried and failed" (*id.* at 4); and (4) did not immediately seal the communications after the July 2 authorization was terminated (*id.* at 6–7).  Behrens also noted that Murray was joining and incorporating by reference Aguiar's arguments to suppress evidence from the April 3, 2009 pen/trap order and "[a]ny evidence discovered under the authority" of the other Title III warrants.  (*Id.* at 7.)

At a hearing on the initial suppression motions, Attorney Williams outlined the factual and legal bases for suppression of the electronic evidence, and Behrens joined in the arguments advanced by Williams.  (Doc. 624 at 29.)  The evidentiary portion of the hearing focused on the "necessity" requirement[6] of wiretap applications.  (*Id.* at 53, 55–56; 57–70.)  The government presented the testimony of DEA Agent Justin Couture

---

[6]  Title III wiretap applications must be supported by a showing of "necessity" under 18 U.S.C. § 2518(1)(c).  That is, "each application for a wiretap [must] include . . . 'a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'"  *United States v. Levy*, No. 1:(S5) 11 Cr. 62(PAC), 2012 WL 5830631, at *3 (S.D.N.Y. Nov. 16, 2012) (quoting 18 U.S.C. § 2518(1)(c), *aff'd*, 626 F. App'x 319 (2d Cir. 2015)).  To sustain its burden, the government need only show some basis to conclude that other investigative techniques were not feasible.  *See* 18 U.S.C. § 2518(1)(c); *United States v. House*, 636 F. App'x 50, 52–53 (2d Cir. 2016).

to establish that a Title III intercept was in fact necessary because of the limitations of other investigative procedures.  (*Id.* at 57–63.)

Defense counsel also challenged the authorization of the July 2, 2009 wiretap application.  Attorney Williams argued that the government had failed "to provide the Court with the full [Title III intercept] authorization memo"[7] for this wiretap.  (*Id.* at 76–77.)  In a Supplemental Motion, Williams elaborated on the claim that law enforcement lacked probable cause to search Aguiar's iPhone, and requested that the Court review the six Orders authorizing the installation of pen/trap devices to determine if the applications were supported by probable cause.  *Aguiar*, No. 2:09-cr-90-1, ECF No. 284 at 1.  Attorney Behrens also challenged the July 2 wiretap application (Doc. 624 at 90–91) and filed a Motion to Join Aguiar's motions, including the supplemental motion, "to the extent applicable to Defendant Murray" (Doc. 286).

A second suppression hearing was held on October 29, 2010, during which counsel renewed challenges to the warrantless search of Aguiar's iPhone, the use of a trap and trace authorization to obtain cell-site-location data, and the government's failure to seal the June 3, 2009 intercept on a timely basis.  (Doc. 625 at 9–18, 23.)  Attorney Williams then filed a second Supplemental Motion to Suppress, *Aguiar*, No. 2:09-cr-90-1, ECF No. 323, again challenging various wiretap applications and related evidence, and a purportedly misleading affidavit that supported the April 3, 2009 pen/trap order, *id.* at 1–3.

---

[7]  Only the Attorney General of the United States, or certain authorized deputies and assistants of the Attorney General, may authorize an application for a wire intercept.  18 U.S.C. § 2516(1).

On January 2, 2011, the Court issued a comprehensive 47-page Memorandum and Order (Doc. 371) denying both Aguiar's and Murray's Motions to Suppress (*see* Doc. 180).  The Court granted Murray's Motion to Join Aguiar's motions to suppress (*see* Doc. 286), but ultimately denied the suppression motions.  *See Aguiar*, No. 2:09-cr-90-1, ECF Nos. 171, 284, 323; (Doc. 371).  The Court thoroughly analyzed all issues raised in the motions except the cell-site-location issue.  (Doc. 371 at 30, 47.)  The Court explained that this issue was moot because the prosecution indicated that it did not intend to introduce cell-site-location data at trial.  (*Id.* at 30.)  Revisiting the issue after granting Aguiar's Motion to Reconsider, *Aguiar*, No. 2:09-cr-90-1, ECF No. 406 at 1–2, the Court held that the challenged Title III warrant was adequately supported by probable cause, even without considering the challenged cell-site data, *id.*, ECF No. 428 at 3–5.

Approximately a week before the start of trial, the prosecution reversed course and filed a Motion in Limine indicating that it would offer cell-site-location data into evidence.  (Doc. 444 at 1.)  Given this changed posture, the Court issued an Order to "address the merits of Mr. Aguiar's [supplemental] motion to suppress [regarding the cell-site-location-data issue] and request for review of probable cause" (Doc. 449 at 1–2), which Murray had joined (*see* Doc. 286; *see also* Doc. 371 (granting motion to join)).  The Court granted the motion for a probable cause review of various hybrid cell-site-data applications—which requested both "pen register and trap and trace information" and cell-site-location data (Doc. 449 at 2)—and "assume[d], without deciding, that the Fourth Amendment requires that the Government meet the probable cause standard in order to collect [cell-site-location information]" (*id.* at 4).  After "re-review[ing]" the hybrid

applications (*id.* at 5), the Court found that probable cause supported each pen/trap order (*id.* at 8).  The Court denied the Supplemental Motion to Suppress the cell-site-location data, and granted the government's Motion in Limine, permitting the introduction of that evidence at trial.  (*Id.*)

Attorney Behrens filed a number of other pretrial motions that are relevant to Murray's current § 2255 claims of ineffective assistance.  First, Behrens filed a Motion to Dismiss "Count 1 of the second superseding indictment as to Defendant Murray for violation of his right to a speedy trial."  (Doc. 200 at 1.)  Behrens also filed a Motion to Sever Murray's trial from that of his codefendants.  (Docs. 212, 212-2.)  He argued that his client would be prejudiced by a joint trial because "the evidence against Mr. Murray is minor and his role is small."  (Doc. 212-2 at 3.)  Behrens asserted, "[t]here is no dispute that the vast majority of the evidence will pertain to the activities and lives of Aguiar and other co[]defendants," and as a result, "[t]here is . . . a real and substantial risk that a jury will likely confuse any role Mr. Murray may have played in the conspiracy and, more importantly, not be able to fairly and impartially decide the issues as they relate specifically to Mr. Murray."  (*Id.*)  The Court denied both motions. (Doc. 377.)  Behrens then filed a motion seeking exclusion of "Aguiar's ongoing . . . communications about Defendant Murray [made] while in jail," because they were not "statements made in the furtherance of the conspiracy."  (Doc. 446 at 4.)  The Court denied this motion (Doc. 493) after a hearing (Doc. 451).

## IV.    Trial

On March 28, 2011, trial commenced against Murray, Aguiar, and Whitcomb.

Other codefendants in the case pleaded guilty, many agreeing to cooperate by providing

testimony.  (PSR at 4, ¶ 12); *see also United States v. Opalenik*, No. 2:09-cr-90-8 (D. Vt.

2009), ECF No. 232; *United States v. Foy*, No. 2:09-cr-90-6 (D. Vt. 2009), ECF No. 250;

*United States v. Grant*, No 2:09-cr-90-5 (D. Vt. 2009), ECF No. 253; *United States v.

Tahair*, No. 2:09-cr-90-4 (D. Vt. 2009), ECF No. 273; *United States v. Reyes*, No. 2:09-

cr-90-9 (D. Vt. 2009), ECF No. 280; *United States v. Mackenzie*, No. 2:09-cr-90-10 (D.

Vt. 2009), ECF No. 287; *United States v. Adcock*, No. 2:09-cr-90-7 (D. Vt. 2009), ECF

No. 302; *United States v. Lawrence*, No. 2:09-cr-90-3 (D. Vt. 2009), ECF No. 317.  After

an 11-day trial, the jury found Aguiar guilty of Count One, conspiring to distribute heroin

and at least five kilograms of cocaine, and guilty of six other counts all relating to the

individual distribution of cocaine.  (Doc. 479.)  It also found Murray and Whitcomb

guilty of conspiring to distribute heroin and at least 500 grams of cocaine.  (*Id.* at 2.)

During trial, the government called 25 witnesses and introduced roughly 200 exhibits.

(*See* Docs. 484, 486.)  The most relevant evidence is summarized below.

### A.    Trial Testimony

The government called multiple DEA agents who were involved in the

investigation.  DEA Task Force Agent Couture, one of the lead investigators, outlined the

initiation of the conspiracy investigation and investigative techniques used by the agents.

(Doc. 613 at 113.)  Couture described the July 30, 2009 arrest of Aguiar, who was

apprehended after a short foot chase during which he dropped a bag containing "[a]

digital scale and two syringes." (*Id.* at 101, 112–15, 138.)  Couture detailed the post-arrest searches of Aguiar's vehicle, cell phones, and iPhone (*id.* at 141–44, 147–49), and the discovery of a package containing 140 grams of cocaine in the immediate area where Aguiar was apprehended (PSR at 6; Doc. 613 at 158, 162–64).

Couture and his co-case agent Jared Hatch described controlled purchases of drug evidence from members of the conspiracy.  These included purchases from coconspirators Jeremy Mackenzie, Herbert Lawrence, Brian Tahair, and Franklin Grant. (*See, e.g.*, *id.* at 215–34, 244–52; *see also* PSR at 6.)  Couture and Hatch detailed the surveillance of members of the conspiracy.  (Doc. 614 at 15–27 (Couture), 30–36 (Hatch).)  For instance, after "receiv[ing] information from the wiretap" that Aguiar and Murray would be meeting (*id.* at 31), Couture described conducting surveillance around Murray's home in Burlington (*id.* at 18), and observing Aguiar with a man who "matched Mr. Murray's description" (*id.* at 32; *see also id.* at 33).  Couture also described: the data that was collected through the pen/trap devices and wiretaps,[8] such as calls between various codefendants (Doc. 521 at 49–88), telephone "switch" information (Doc. 614 at 173–218), Aguiar's MySpace page (Doc. 615 at 149–54), and Aguiar's credit card statements (Doc. 617 at 23–26).

Additional DEA agents testified about their roles in the investigation and surveillance of members of the conspiracy.  (Doc. 614 at 39–63, 93–108.)  For example,

---

[8]  As noted above, recordings of the Title III intercepts were also presented at trial, including one in which Aguiar and Murray discussed Murray's heroin distribution and sales.  (*See, e.g.*, Doc. 521 at 158–72; Doc. 633 at 202–03 (Tahair testimony deciphering phone call played in court).)  The PSR summarized wiretap intercepts of conversations between Aguiar and Murray between July 4 and July 23, 2009, concerning cocaine transactions.  (*See* PSR at 7, ¶ 24.)

Agent Adam Chetwynd testified that after learning through a wiretap that Aguiar was going to meet Tahair and Murray (Doc. 614 at 98), he observed two males in a car, one of whom "matched the general description of what William Murray was wearing earlier in the night" (*id.* at 99).  Later, those males were seen outside of Murray's apartment building.  (*Id.* at 102.)  Agent Richard Carter testified about his installation of GPS tracking devices and the tracking of Aguiar's vehicles.  (Doc. 614 at 104–19, 134–64.)  Using the GPS data, Agent Carter described Aguiar's travel pattern between Vermont and Dorchester, Massachusetts.  (*Id.* at 134–64.)  Other DEA Special Agents testified about physical surveillance of Aguiar conducted in Massachusetts (Doc. 616 at 205–22), and the execution of search warrants at Aguiar's Vermont and Massachusetts residences, including the seizure of $45,000 in currency from a secret compartment in a closet at Aguiar's Quincy, Massachusetts residence (Doc. 617 at 111–16, 120–30).

Several records custodians and summary witnesses corroborated the government's other evidence.  This evidence included the following: evidence of Aguiar's vehicle purchases (Doc. 616 at 188–204); Aguiar's substantial cash deposits into his bank accounts (Doc. 617 at 54–71; 73–98); Verizon wireless cell phone data and court orders Verizon received in this case (Doc. 523 at 208–47); technology used by law enforcement to capture the audio from phone calls between Aguiar and his associates (Doc. 521 at 5–44; 49–69); analyses of phone calls between the coconspirators (Doc. 616 at 4–47); laboratory analyses of samples in this case that tested positive for cocaine and heroin (*id.* at 48–68); and an arrest of Aguiar in New Hampshire for reckless driving, during which a

14

New Hampshire State Trooper seized $8,600 in currency from Aguiar (Doc. 617 at 98–109).

The government called multiple codefendants who recounted their involvement with Aguiar and their participation in the Burlington-area drug distribution. (*See* Doc. 521 at 92–222, 235–48; Doc. 522 at 4–159; Doc. 523 at 16–207; Doc. 615 at 4–101; Doc. 616 at 76–188; Doc. 633 at 124–208.) These individuals described their respective roles in the lengthy drug conspiracy, their illicit dealings with Aguiar, and Aguiar's supervisory role. In summary, each described in detail how, when, and where they acquired cocaine and heroin from Aguiar, and Murray's role in the conspiracy.

Brian Tahair testified at length about his dealings with Murray. (Docs. 615, 633.) He stated that "[a]t some point" Murray asked Tahair if he "was interested in moving some cocaine." (Doc. 633 at 151.) Tahair explained that he received "two ounces to six ounces" of cocaine for four to six weeks from Murray, and received more than that amount a "couple times." (*Id.* at 157.) Tahair acknowledged that he knew that the cocaine was coming from Aguiar through Murray. (Doc. 615 at 5–7.) Tahair explained that he became involved with Aguiar after Murray had apparently left for Maine (Doc. 633 at 175), and described Aguiar's anger because Murray had "ripped him off for eight or [ten] ounces of cocaine" (*id.* at 171). Tahair testified that he began receiving cocaine directly from Aguiar (*id.* at 175–77), and that the packaging of this cocaine was the same as that which had come from Murray (*id.* at 194). Tahair told Murray he was dealing directly with Aguiar when Murray returned from a trip to Maine. (*Id.* at 176–77.)

15

Jessica Adcock described accompanying Aguiar, who brought cocaine to the residence where Murray lived with his girlfriend Pat.  (Doc. 522, at 27–28.)  As discussed below, Pat was identified as Patricia Niemann.  Adcock explained that Murray "arrang[ed] to get a certain amount of cocaine from [Aguiar], and . . . he fell through with his part of the bargain and ended up owing [Aguiar] money and took off . . . to Maine." (*Id.* at 28.)

Former Burlington Police Officer Michael Morris searched the residence of Patricia Niemann, Murray's former girlfriend, where he seized a small quantity of cocaine.  (*Id.* at 163–64.)  As Niemann's testimony later revealed, she had been in an intimate relationship with Murray from late 2007 into 2008 and lived with him beginning in 2007.  (*Id.* at 182.)  Burlington Police Officer Matthew Cannon also searched Niemann's residence after receiving a call from Niemann about "drugs or paraphernalia in her apartment."  (*Id.* at 172.)  According to Cannon, Niemann had found some of Murray's items and "didn't want them in the house anymore."  (*Id.* at 173.)  Cannon testified that the items included "spoons, syringes, [and a] prescription bottle," which "contained what appeared to [Cannon] to be a large marble-sized rock of heroin."  (*Id.*) The marble-sized rock later tested positive for heroin.  (*Id.* at 175.)  Cannon confirmed that the heroin "looked like it had broken off . . . a finger of heroin," which Cannon described as a compressed piece of heroin.  (*Id.* at 173.)

Niemann testified that Murray kept an item she described as resembling a "chalk stick" under the mattress (*id.* at 183), and that she observed Murray shaving bits of the stick into bags in their living room (*id.* at 184).  She also described receiving heroin from

Murray on one occasion.  (*Id*. at 186.)  She described Aguiar's visits to their house, during which Murray and Aguiar met in private.  (*Id*. at 193–94.)  Moreover, she testified about two instances when the Burlington Police came to her house, seizing cocaine the first time and a "stash box" containing the "chalk stick" in a pill bottle the second time—neither of which belonged to Niemann.  (*Id*. at 197–99.)

### B.    Other Evidence

Over 200 documents and tangible objects were admitted at trial.  (Docs. 482, 484.) These included: quantities of cocaine purchased or otherwise seized in the investigation; recordings of the controlled purchases; photographs of key locations in the investigation; photographs taken from Aguiar's MySpace page and iPhone; various cell phones, including TracFones and an iPhone; contact lists from cell phones; call details;[9] the duffle bag found during Aguiar's arrest, which contained syringes and a scale in a hidden compartment; letters from Aguiar to his codefendants; and court orders.  (*Id.*)

### C.    Defense Case

When the government rested, Attorney Behrens moved for a Judgement of Acquittal.  Behrens argued that the evidence had established only the existence of a "buyer-seller" relationship between Murray and Aguiar and that the government had failed to prove its quantity allegation against Murray.  The Court denied the motion insofar as it sought acquittal of Murray on the conspiracy charge, but reserved judgment on the drug quantity allegation set forth in the Indictment.  (Doc. 617 at 161–65.)

---

[9]  "Call detail records would show incoming and outgoing calls, switches, the date of the call, the time of the call, the duration of the call."  (Doc. 523 at 214 (testimony of Alexis Eon).)

Behrens then called Officer Kristian Young, who testified about physical surveillance of Murray. (*Id.* at 172–77.) According to Young, surveillance officers had observed Murray meeting for a brief period with a woman and suspected that a drug transaction had occurred. But when the woman was approached, no drugs were found in her possession. Seeking to establish that his client was only a user of controlled substances, Behrens also called Judy Murray, the sister of his client. (*Id.* at 178–89.) She testified about begging Murray to come home to Maine to "get clean." (*Id.* at 180.) She described Murray's time in Maine, where he stayed at their mother's house for a few days and was "withdrawing from heroin," before apparently leaving for Portland. (*Id.* at 183–85.) Behrens then rested his case. (*Id.* at 189.)

### D.      Verdict

On April 11, 2011, the jury found Murray, along with Aguiar and Whitcomb, guilty on Count 1 of the Redacted Fourth Superseding Indictment. (Doc. 478; *see also* Doc. 479 at 2.) Specifically, the jury found Murray guilty of participating in a conspiracy with others to distribute heroin and 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846. (*Id.*; *see also* Doc. 477 at 1.)

Murray, through Behrens, renewed his Motion for Judgment of Acquittal, or in the alternative, moved for a new trial. (Doc. 499.) Murray argued that the evidence did not prove that he knew the conspiracy involved 500 grams or more of cocaine, or that this amount was reasonably foreseeable to him. (*Id.* at 2–6.) The Court denied this Motion, holding that there was sufficient evidence to convict Murray and "to find that his offense involved 500 grams or more of cocaine." (Doc. 512 at 9.)

**V.      Presentence Investigation Report and Sentencing**

Before sentencing, the U.S. Probation Office submitted the PSR to the Court, which concluded that Murray's offense level under the advisory United States Sentencing Guidelines (USSG) was 26, with a criminal history category of VI.  (PSR at 34, ¶ 118.) As a result, the USSG imprisonment range was from 120 to 150 months, with supervised release of not less than four years.  (*Id.* ¶¶ 118, 121.)  The defense submitted objections to the PSR for the Court's consideration (*see id.* at 37 (Addendum to the Presentence Report)), including Attorney Behrens's objections to any findings that Murray was involved in a conspiracy to distribute cocaine.  (*Id.*)  Behrens also objected to the report's characterization of Tahair's testimony regarding how long Murray sold cocaine to Tahair, and the drug-quantity calculation, upon which the offense level was based.  (*Id.*)

Both parties filed sentencing memoranda.  Attorney Behrens argued for a variance or a downward departure from the Guidelines sentence to a term of imprisonment of 60 months.  (Doc. 576 at 5.)  The memorandum highlighted Murray's commitment to his recovery and his family (*id.* at 5–6), along with his struggles with depression and addiction after the mother of his children had an affair (*id.* at 6).  The memorandum also discussed Murray's "minor or limited" role as "compared to other co[]defendants." (*Id.* at 7.)  Behrens requested a "Minor Role Reduction" and downward departure for "Extraordinary Physical Impairment."  (*Id.* at 11.)  In opposition, the government argued for a 150-month term of custody followed by supervised release, agreeing with the USSG calculation and factual determinations set forth in the PSR.  (Doc. 574 at 1, 2.)

Murray appeared before Judge Sessions for sentencing on December 12, 2011. (Docs. 584, 627.)  Behrens reiterated arguments from the sentencing memorandum, advocated for a lower criminal history category, and called Judy Murray to testify.  (Doc. 627 at 6, 15–17, 20–21.)  Murray also addressed the Court himself, describing his history of drug use, his relationship with Aguiar, and his efforts at rehabilitation.  (*Id.* at 25–31.) The government argued against any mitigating role adjustment (*id.* at 31), stressing Murray's level of involvement with Aguiar (*id.* at 38), and disputing the impact of his breakup with his children's mother (*id.* at 36).  The government asserted that Murray's circumstances did not warrant a variation from the imprisonment range called for by the advisory Sentencing Guidelines.  (*Id.* at 42.)

After hearing from the parties, Judge Sessions engaged in a thorough analysis of the sentencing factors under 18 U.S.C. § 3553(a).  The Court applied an offense level of 26 and declined to apply the minor role adjustment, ultimately finding no "sufficient ground for departure."  (*Id.* at 44.)  With regard to the request for a variance, the Court stated that there were some factors that "warrant[ed] a modest adjustment from the guideline range" (*id.* at 45), including Murray's short period of involvement and "positive characteristics" suggesting Murray could have a successful rehabilitation (*id.* at 46). Balancing these factors against the seriousness of his conduct, the Court adjusted the range down two levels—from 26 to 24—resulting in a "range of 100 to 125 months" imprisonment.  (*Id.* at 46; *see also id.* at 47.)  The Court then imposed a sentence of 100 months in custody to be followed by four years of supervised release.  (*Id.* at 47.)  Murray was advised of his right to pursue a direct appeal.  (*Id.* at 50.)

20

## VI.    Direct Appeal

Murray filed a Notice of Appeal through Attorney Behrens.  (Doc. 595.)  On appeal, Behrens argued that: (1) unlawful GPS evidence was central to the investigation and trial, and such evidence should be suppressed, Appellant Murray's Br. at 20–28, *United States v. Aguiar*, 737 F.3d 251 (2d Cir. 2013) (No. 11–5262–cr(L)); (2) the District Court erred in failing to hold an evidentiary hearing related to the July 2, 2009 wiretap authorization, *id.* at 35–39; (3) the Court erred by denying Murray a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), on the discrepancy in an affidavit supporting the April 3, 2009 pen/trap application, *id.* at 39–44; and (4) the Court erred by denying Murray's Motion to Suppress evidence from the Title III warrants, because the government had not met the necessity requirement, *id.* at 44–50.

The Second Circuit affirmed the convictions of Aguiar, Murray, and Whitcomb. *Aguiar*, 737 F.3d at 265.  First, the Court of Appeals examined the GPS tracking issue, discussing the evolution of the law surrounding "tracking technology."  *Id.* at 256.  The court explained that the U.S. Supreme Court's decision in *United States v. Jones*, 132 S. Ct. 945 (2012), decided just weeks after Murray filed his Notice of Appeal, had altered Fourth Amendment jurisprudence regarding GPS tracking.  *Aguiar*, 737 F.3d at 258–60. In *Jones*, the Supreme Court "held that 'the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a "search"' within the meaning of the Fourth Amendment."  *Id.* at 258 (quoting *Jones*, 132 S. Ct. at 949).  The Second Circuit noted, however, that the Supreme Court had not resolved the question of "whether the warrantless use of GPS devices

would be 'reasonable—and thus lawful—under the Fourth Amendment [where] officers

ha[ve] reasonable suspicion, and indeed probable cause' to execute such a search." *Id.* at

259 (alterations in original) (quoting *Jones*, 132 S. Ct. at 954).  Consequently, the Second

Circuit applied the "good-faith exception" to the warrant requirement, concluding that

law enforcement relied on then-binding precedent to install and monitor the GPS devices.

*Id.* at 261–62.  The Second Circuit found that "law enforcement could reasonably

conclude placing a GPS device on the exterior of Aguiar's vehicles did not violate the

Fourth Amendment."  *Id.* at 261.

Turning to the next argument, the Second Circuit upheld the Court's denial of the

motion to suppress evidence derived from the April 3, 2009 pen/trap order, which had

been supported by an affidavit containing an incorrect phone number, and denial of the

request for a hearing pursuant to *Franks*, 438 U.S. 154.  *Id.* at 262–63.  The Court of

Appeals agreed with Judge Sessions's analysis, finding:

> [E]ven if the false statement were stricken from the affidavits, the affidavits
> are replete with information regarding controlled purchases of cocaine, in-
> person surveillance of Aguiar's travels and the use of multiple "burn" cell
> phones to conduct business among the target subjects—all of which would
> satisfy the necessary grounds to issue a hybrid order.

*Id.* at 263.  The Second Circuit also upheld the District Court's ruling with regard to the

search of Aguiar's iPhone, holding that "any error resulting from the introduction of

evidence collected from Aguiar's cell phone was harmless."  *Id.*

The Second Circuit agreed with the Court's denial of a hearing on the issue of the

missing page from the DOJ authorization memorandum.  *Id.* at 263–64.  The court stated:

22

> The affidavit submitted to the district court attached a complete copy of the filing that the government received from the clerk's office, and it is unclear what else the government could do to prove its contention that it submitted a complete application to the court. We find no error in the district court's refusal to conduct a hearing.

*Id.* at 264. All remaining claims were rejected without discussion. *Id.* at 265.

## VII.   Section 2255 Motion and Motion for Joinder

On September 28, 2015, Murray filed the instant § 2255 Motion, arguing that Attorney Behrens was ineffective prior to trial, and during trial, sentencing, and direct appeal. (Doc. 726.) In his Motion, he sets forth five ineffective assistance claims, all of which were raised by codefendant Aguiar with respect to Attorney Williams's representation in a § 2255 motion, *Aguiar*, No. 2:09-cr-90-1, ECF No. 717, that has since been denied by this Court, *id.*, ECF No. 780 (adopting Report and Recommendation).[10] Specifically, Murray claims that Attorney Behrens's performance was deficient because he: (1) did not take immediate action when the government failed to give him complete copies of certain Title III applications before Murray's detention hearing (Doc. 726-1 at 2–6); (2) did not immediately challenge, investigate, or argue government misconduct when the government failed to include the complete DOJ authorization for the July 2, 2009 wiretap warrant (*id.* at 6–10); (3) failed to move for Judge Sessions's recusal from suppression hearings on the July 2 wiretap warrant (*id.* at 10–14); (4) failed to raise the issue of prosecutorial misconduct on appeal (*id.* at 14–15); and (5) failed to move to

---

[10]   In December 2015, Murray moved to consolidate his and Aguiar's § 2255 motions. (Doc. 738.) The Court denied Murray's Motion because "[t]he conduct of two separate attorneys is challenged, involving different facts regarding the representation of each defendant, and differing legal strategies may have been involved in the defense of each defendant." (Doc. 744.) In any event, Aguiar's § 2255 motion has now been denied. *Aguiar*, No. 2:09-cr-90-1, ECF No. 780.

suppress three wiretap warrants under *Franks*, on the basis that the government did not meet the "necessity" requirement (*id.* at 15–17).

Again, Murray requests the opportunity to join in Aguiar's motion where it raises grounds that Murray's Motion did not. (*Id.* at 17.) Additionally, Murray seeks to join four related motions filed by codefendant Aguiar. (Doc. 762.) As noted above, all of these motions were denied by the Court's Opinion and Order, *Aguiar*, No. 2:09-cr-90-1, ECF No. 780, and Murray's Motion for Joinder (Doc. 762) is accordingly DENIED as moot. The Court also denied Aguiar's § 2255 motion in its entirety. *Aguiar*, No. 2:09-cr-901, ECF No. 780. Murray's § 2255 claims here fail for many of the same reasons.

### Analysis

A prisoner in federal custody may file a motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. 28 U.S.C. § 2255(a). Generally, relief under § 2255 is available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)). The burden of proof on a § 2255 motion falls on the claimant by "a preponderance of the evidence." *Triana v. United States*, 205 F.3d 36, 40 (2d Cir. 2000); *see also Napoli v. United States*, 45 F.3d 680, 683 (2d Cir. 1995) (noting "usual burden" on petitioners).

### I.    Ineffective Assistance of Counsel

The Sixth Amendment protects the right to effective assistance of counsel at all critical stages of the proceedings, *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir.

2013), including various pretrial proceedings, *see, e.g.*, *Kimmelman v. Morrison*, 477

U.S. 365, 384–85 (1986) (pretrial suppression motion), and on appeal, *Smith v. Murray*,

477 U.S. 527, 535–36 (1986).

To prevail on an ineffective assistance of counsel claim, a claimant must satisfy

the two-pronged *Strickland* test, demonstrating both that: (1) counsel's performance was

objectively deficient, and (2) petitioner was actually prejudiced as a result.  *Strickland v.*

*Washington*, 466 U.S. 668, 687–88, 691–93 (1984); *see also Bennett v. United States*,

663 F.3d 71, 84 (2d Cir. 2011).  Attorney representations at the trial and appellate stages

of litigation are assessed under the same *Strickland* standards.  *Smith*, 477 U.S. at

535–36; *Aparicio v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001) ("Although it was born in the

context of ineffective assistance of trial counsel, *Strickland*['s] two-prong test applies

equally to claims of ineffective assistance of appellate counsel on a defendant's first

appeal as of right." (citing *Evitts v. Lucey*, 469 U.S. 387, 396–97 (1985))).

Under *Strickland*'s performance prong, an attorney's performance is deficient

"when it falls 'below an objective standard of reasonableness,' as determined by

reference to 'prevailing professional norms.'"  *Morales v. United States*, 635 F.3d 39, 43

(2d Cir. 2011) (quoting *Strickland*, 466 U.S. at 688).  The petitioner's burden is

significant because "the court must 'indulge a strong presumption that counsel's conduct

falls within the wide range of reasonable professional assistance.'"  *Raysor v. United*

*States*, 647 F.3d 491, 495 (2d Cir. 2011) (quoting *Strickland*, 466 U.S. at 689).  The

determinative question is not whether counsel "deviated from best practices or most

common custom," but rather whether the "representation amounted to incompetence

under prevailing professional norms." *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

Notably, "strategic choices made after thorough investigation of law and facts relevant to

plausible options are virtually unchallengeable." *DeLuca v. Lord*, 77 F.3d 578, 588 (2d

Cir. 1996) (quoting *Strickland*, 466 U.S. at 690). Finally, an attorney's "[f]ailure to make

a meritless argument does not amount to ineffective assistance." *United States v.*

*Regalado*, 518 F.3d 143, 149 n.3 (2d Cir. 2008) (alteration in original) (quoting *United*

*States v. Arena*, 180 F.3d 380, 396 (2d Cir. 1999)).

With regard to *Strickland*'s prejudice prong, the claimant must prove "that there is

a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Hill v. Lockhart*, 474 U.S. 52, 57 (1985)

(quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability

sufficient to undermine confidence in the outcome." *Harrington*, 562 U.S. at 104

(quoting *Strickland*, 466 U.S. at 694).

Murray faces an additional challenge here because the Court has already rejected

identical ineffective assistance claims made by Aguiar with respect to Attorney Williams

under *Strickland*. *See Aguiar*, 2:09-cr-90-1, ECF No. 780 (adopting Report and

Recommendation, *id.*, ECF No. 767). This is especially problematic for Murray because

Behrens joined many of Williams's motions and arguments, and utilized a similar

strategy to Williams—held by this Court to constitute reasonable assistance. In denying

Aguiar's § 2255 motion, Judge Sessions "recall[ed] the thorough and vigorous arguments

advanced by . . . Williams in his role as defense counsel." *Id.* at 2. Moreover, Judge

Sessions noted that the evidence supporting Aguiar's conviction was "overwhelming"

and "even considering the aggregate impact of any alleged errors [by Williams], the sheer volume of evidence negated any resulting prejudice." *Id.* at 3. This reasoning applies with equal force to any alleged failings by Behrens in his representation of Murray.

### A.   Failure to Act Immediately After the Government Did Not Timely Provide Defense with Complete Copies of Warrants

Murray argues that Behrens provided ineffective assistance "because he failed to take immediate action" when the government allegedly violated 18 U.S.C. § 2518(9) and his due process rights. (Doc. 726-1 at 2.) Specifically, Murray claims the government's failure to provide both the "primary" June 3 warrant, and the complete copy of the July 2, 2009 warrant application, ten days before his detention hearing violated § 2518(9)'s notice requirement. (*Id.* at 3–4.) Murray states that the July 2 warrant was incomplete because it was missing the DOJ authorization page. (*Id.* at 5.) Murray argues that he was prejudiced by Behrens's failure to raise the § 2518(9) violations because the government was subsequently able to gain many advantages, including Murray's detention, through its use of wiretap evidence and/or "derivative evidence." (*Id.*) He also asserts that Behrens's failure to act immediately after learning of the omission from the July 2 warrant was prejudicial because the original copy of the warrant was destroyed. (*Id.* at 6.)

The government responds that Behrens litigated "the notice issue" with respect to the June 3 warrant (Doc. 749 at 19), and that the Court "carefully considered," but ultimately rejected the defense argument that the July 2 wiretap was not properly authorized (*id.* at 20). The government also contends that even if Behrens had raised the

missing authorization page issue sooner, it would not have affected the Court's ruling. (*Id.*)  Addressing this issue, Attorney Behrens states in his Affidavit that he "filed a timely motion to suppress" when he "learned of the missing authorization" for the July 2 wiretap.  (Doc. 779 at 2, ¶ 7.)

Subsection (9) of § 2518 mandates that the contents of intercepted wire communications will "not be received in evidence or otherwise disclosed in any trial, hearing, or other proceeding . . . unless each party, not less than ten days before the trial, hearing, or proceeding, has been furnished with a copy of the court order, and accompanying application, under which the interception was authorized or approved." 18 U.S.C. § 2518(9).  A detention hearing qualifies as a "proceeding" under § 2518(9). *See United States v. Orena*, 883 F. Supp. 849, 854 n.2 (E.D.N.Y. 1995); *United States v. Salerno*, 794 F.2d 64, 69–70 (2d Cir. 1986), *rev'd on other grounds*, 481 U.S. 739 (1987).  "The purpose of [§ 2518(9)'s] requirement is to afford the defendant 'an opportunity to make a pretrial motion to suppress . . . .'"  *United States v. Melendez-Carrion*, 790 F.2d 984, 994 (2d Cir. 1986) (quoting S. Rep. No. 90-1097, at 105–06 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2195).

Murray contends that Behrens's alleged failure to "act immediately" in challenging the government's purported violation of § 2518(9) allowed the government to hold "adversary hearings" resulting in Murray's detention.  (Doc. 726-1 at 2.)  A review of the record, however, reveals that Murray consented to an Order of Detention. (Doc. 63.)  As a result, it was reasonable for Behrens to not contest the government's failure to comply with § 2518(9)—Murray's consent to detention removed the adversarial

nature of the detention hearing and the need for the safeguards provided by § 2518(9).

Murray's argument fails, therefore, because "[f]ailure to raise frivolous arguments does

not give rise to ineffective assistance of counsel." *Hiraldo v. United States*, No. 05 CV

0760(SJ), 2006 WL 1794775, at *6 (E.D.N.Y. June 7, 2006).

Moreover, the government's alleged failure to comply with § 2518(9) did not

prevent Behrens from filing a pretrial motion to suppress. Behrens filed a Motion to

Suppress the July 2 wiretap once the authorization issue came to light. (Doc. 180); *see

also Aguiar*, 2:09-cr-90-1, ECF No. 171. Behrens's failure to act "immediately" was not

deficient. Rather, the filing of a motion to suppress was clearly a reasonable strategy, and

Behrens, along with Attorney Williams, vigorously challenged the July 2 warrant

throughout the pretrial and appellate stages of litigation. Murray has not suggested any

other, more "immediate," actions that Behrens should have taken, and the Second Circuit

is "reluctant to second guess matters of trial strategy simply because the chosen strategy

has failed." *United States v. Aulet*, 618 F.2d 182, 189 (2d Cir. 1980).

Additionally, Murray fails to satisfy *Strickland*'s prejudice prong. He has not

demonstrated that more immediate action by Behrens would have led to his release, or

more importantly, his acquittal. Murray had an extensive prior criminal record (*see* PSR

at 34) and was charged with participating in a serious Title 21 conspiracy. There is no

reasonable probability that the Court would have released him. Accordingly, Murray has

not "undermine[d] confidence in the outcome" of the case. *See Harrington*, 562 U.S. at

104 (quoting *Strickland*, 466 U.S. at 694). Moreover, as explained by Judge Sessions in

his Opinion and Order denying Aguiar's parallel § 2255 motion, the government's

evidence presented at trial was "overwhelming."  *Aguiar*, No. 2:09-cr-90-1, ECF No. 780
at 3.  Even if Behrens had provided ineffective assistance, "the sheer volume of
evidence" against Murray, like Aguiar, "negated any resulting prejudice."  *Id.*

### B.  Failure to Adequately Investigate or Argue Government Misconduct in the July 2, 2009 Warrant Authorization

In addition to faulting Behrens for not immediately challenging the July 2 wiretap
application, Murray also claims that Behrens's "performance was deficient by failing to
take immediate investigative action, call witnesses, or argue" government misconduct
with respect to this warrant.  (Doc. 726-1 at 6–7.)  Murray states that Behrens failed to
call any witnesses, including a court clerk, whose testimony would have allegedly
demonstrated government misconduct in failing to properly secure DOJ authorization for
the July 2 warrant application.  (*Id.* at 9.)  The government counters that the claim
concerning the DOJ authorization was "extensively litigated."  (Doc. 749 at 21–22.)
Ultimately, the Court concluded that the wiretap was properly authorized (*id.*), and this
determination was affirmed by the Second Circuit (*id.* at 22).

Consistent with the government's assertions, Behrens notes in his Affidavit that
"the government had presented evidence . . . which showed that it had obtained DOJ
authorization prior to presenting the wiretap application to the [C]ourt."  (Doc. 779 at 2,
¶ 7.)  Behrens also explains that he did not call witnesses from the clerk's office because
the Court's "sole focus" was whether the wiretap was properly authorized and calling
these witnesses "would have been futile."  (*Id.*)

Murray's claim fails for the same reasons the Court rejected Aguiar's identical contention. *See Aguiar*, No. 2:09-cr-90-1, ECF No. 767 at 57–58, *report and recommendation adopted*, *id.*, ECF No. 780.  The July 2 warrant authorization issue was adequately and appropriately litigated before the trial and appellate courts by both Behrens and Williams.  First, Behrens filed a Motion to Suppress challenging the incomplete July 2 warrant authorization.  (Doc. 180 at 2.)  He also joined Attorney Williams's arguments made at the August 4, 2010 suppression hearing (Doc. 624 at 29), and joined in motions filed by Williams on Aguiar's behalf (*see* Doc. 286).  Williams and Behrens diligently pursued the missing authorization issue at the August 4 suppression hearing and argued that the government's evidence was not sufficient to prove that the full memorandum had been submitted to the Court.  (Doc. 624 at 76–86.)  Aguiar, and by consequence Murray, did not prevail on this point, and the Second Circuit affirmed the District Court ruling.  Even though Behrens (and Williams) did not challenge the July 2 wiretap evidence in the precise manner espoused by Murray, Behrens vigorously advanced other arguments for the suppression of this evidence, which demonstrated Behrens's "active and capable advocacy." *Harrington*, 562 U.S. at 111.

Moreover, as stated in his Affidavit, Behrens made the strategic decision not to call witnesses from the clerk's office, deferring to the "[C]ourt's position" that further evidence from that office would not help.  (*See* Doc. 779 at 2, ¶ 7.)  Indeed, the Court ultimately found that the July 2 warrant was valid: "The Government has provided the Court with electronic copies of documents verifying that [Deputy Assistant Attorney General] Keeney did in fact authorize the warrant application for the July 2 order."

(Doc. 371 at 25.)  Accordingly, Behrens's strategy was objectively reasonable and he cannot be faulted for failing to argue prosecutorial misconduct—a clearly meritless argument.  *See Regalado*, 518 F.3d at 149 n.3.

### C.    Failure to Seek Recusal of Judge Sessions

Murray claims that Attorney Behrens was ineffective by failing to argue for Judge Sessions's recusal.  Murray asserts that Judge Sessions "was a potential witness as to the missing DOJ authorization page" in the July 2 wiretap warrant, which "created a clear conflict of interest that affected [his] ability to be impartial."  (Doc. 726-1 at 10–11.)  Murray also contends that Judge Sessions "had 'a personal bias or prejudice' against ruling in favor of Defendants in the trial court and he should have recused himself voluntarily given the situation."  (*Id.* at 13.)

The government responds that "[t]here is nothing in this case to support the claim that Judge Sessions was not impartial, or . . . had a personal bias or prejudice" (Doc. 749 at 23), and even if Judge Sessions had recused himself, another judge would have ruled the same way on the suppression motions (*id.* at 24).  Behrens states that he consulted with Attorney Williams on this issue and that they concluded "that there was no legal basis" for seeking Judge Sessions's recusal.  (Doc. 779 at 2, ¶ 8); *see also Aguiar*, No. 2:09-cr-90-1, ECF No. 737-1 at 2, ¶ 8.

Murray's argument—which is identical to Aguiar's—appears to be founded on Murray's beliefs that (1) Judge Sessions was a potential witness on the issue of the missing DOJ authorization page (*see* Doc. 726-1 at 10–11), and (2) Judge Sessions had a "conflict of interest," bias, and/or knowledge requiring him to recuse himself from ruling

on the suppression motion (*id.* at 11–13). For the same reasons Aguiar's claims failed, these assertions are similarly meritless. *See Aguiar*, No. 2:09-cr-90-1, ECF No. 767 at 58–63, *report and recommendation adopted, id.*, ECF No. 780.

### 1.    Impartiality and Knowledge

Section 144 of Title 28 "requires recusal if a judge harbors a 'personal bias or prejudice' against a party." *Lyman v. City of Albany*, 597 F. Supp. 2d 301, 307 (N.D.N.Y. 2009) (quoting 28 U.S.C. § 144); *see also* 28 U.S.C. § 455(b)(1). Recusal is also necessary "when a judge's 'impartiality might reasonably be questioned.'" *Lyman*, 597 F. Supp. 2d at 307 (quoting 28 U.S.C. § 455(a)). A party seeking recusal may file a motion supported by an affidavit presenting "the facts and the reasons for the belief that bias or prejudice exists." *United States v. Trudeau*, CRIMINAL ACTION NO. 10-CR-234 (JCH), 2016 WL 591754, at *3 (D. Conn. Feb. 11, 2016) (quoting 28 U.S.C. § 144). "To be disqualifying under [28 U.S.C.] § 455, '[t]he alleged bias and prejudice . . . must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge has learned from his participation in the case.'" *S.E.C. v. Razmilovic*, 738 F.3d 14, 29 (2d Cir. 2013) (second and third alterations in original) (emphasis omitted) (quoting *In re Int'l Bus. Machines Corp.*, 618 F.2d 923, 927 (2d Cir. 1980)); *see also Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 447–48 (2d Cir. 2005) ("Knowledge gained from the judge's discharge of his judicial function is not a ground for disqualification under 28 U.S.C. § 455(b)(1)." (citing *Katsaros v. Cody*, 744 F.2d 270, 283 (2d Cir. 1984))). Similarly, the judge's ruling on a prior case, even if "adverse to a defendant," is not a ground for recusal. *Petrucelli v. United States*, Nos. 14 Civ 9310, 02

CR 99, 2015 WL 5439356, at *5 (S.D.N.Y. Sept. 15, 2015).  Bias or impartiality may be shown, however, if the judge "display[s] a deep-seated favoritism or antagonism that would make fair judgment impossible."  *Razmilovic*, 738 F.3d at 29 (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)).

Murray argues that a judge's knowledge of prior proceedings and adverse rulings against a defendant can demonstrate bias.  Murray contends that Judge Sessions had "personal knowledge of [a] disputed evidentiary fact[]"—the missing DOJ authorization page—by reviewing the July 2 wiretap application.  (Doc. 726-1 at 12 (second alteration in original)); *see also* 28 U.S.C. § 455(b)(1).  This argument is clearly contradicted by the established recusal principles, and by *United States v. Carlton*, 534 F.3d 97, 101 (2d Cir. 2008)—cited by Murray—in which it was held that a judge's knowledge from a prior proceeding does not warrant recusal in a subsequent criminal trial.  *Id.*  Accordingly, Judge Sessions's familiarity with the July 2 wiretap application did not warrant his recusal.

Murray also claims that Behrens's failure to file a recusal motion resulted in prejudice because Judge Sessions would have had to recuse himself "as a matter of law" under §§ 144 and 455 had a motion been filed.  (Doc. 726-1 at 13.)  When a party moves for a judge's recusal by filing an "affidavit of prejudice," *Trudeau*, 2016 WL 591754, at *4 (quoting *Nat'l Auto Brokers Corp. v. Gen. Motors Corp.*, 572 F.2d 953, 958 (2d Cir. 1978)), a judge "has an affirmative duty to inquire into the legal sufficiency of such an affidavit and not to disqualify himself unnecessarily," *id.* (quoting *Nat'l Auto Brokers Corp.*, 572 F.2d at 958).  Murray presents no evidence, however, that any legal basis

existed to warrant the filing of an affidavit of prejudice.  His claim is thus meritless and Behrens cannot be faulted for failing to raise it.  *See Regalado*, 518 F.3d at 149 n.3.

### 2. Potential to Serve as a Witness

Murray also asserts that Behrens should have moved to recuse Judge Sessions because the Judge was a potential witness at the suppression hearing on the July 2 wiretap evidence.  (Doc. 726-1 at 10, 13.)  Murray claims that if the Judge had been recused, Murray would have been afforded an "evidentiary hearing" and "the July 2, 2009 wiretap [evidence] would have been suppressed."  (*Id.* at 13–14.)

Not only does Murray fail to prove this claim, he also inverts the legal analysis. When a party requests an evidentiary hearing, asserting that the presiding judge may be a witness, that judge must first determine whether the hearing is warranted.  "[T]he determination of the need for a hearing and the request for recusal go hand in hand: If a hearing is necessary and the Court is a material witness, recusal follows; if no hearing is required, recusal as a witness is not at issue."  *United States v. Rivera*, 634 F. Supp. 204, 210 (S.D.N.Y. 1986).  Therefore, if Behrens had asserted that Judge Sessions was a potential witness, the Court would have been required to determine if an evidentiary hearing was necessary.  *See id.* ("[T]he Court need not consider recusal *before* determining whether a hearing is required.  The merely conclusory assertion that a hearing is required does not mandate recusal.")  Prior to that determination, there was no ground for Judge Sessions's recusal.  *See King v. United States*, 576 F.2d 432, 437 (2d Cir. 1978) ("[A]ssuming [the judge] would be a witness this would not disqualify him

prior to the hearing, specifically from determining whether a hearing should be held." (citing *Panico v. United States*, 412 F.2d 1151, 1155–56 (2d Cir. 1969))).

In this case, the record clearly reveals that an evidentiary hearing was unnecessary. At the first suppression hearing, Attorney Williams pressed for more evidence on the issue of the missing authorization page. (Doc. 624 at 76–86.) The Court concluded that the government had received appropriate approval from a DOJ official for the July 2 wiretap warrant (Doc. 371 at 25). The Second Circuit affirmed this ruling, finding "no error in the district court's refusal to conduct a hearing." *Aguiar*, 737 F.3d at 264. Therefore, the Court need not address Murray's assertions regarding possible evidence at, or outcomes of, such an evidentiary hearing (*see* Doc. 726-1 at 11, 14), because there was no reasonable probability that Judge Sessions would have granted one.

### D. Failure to Raise Prosecutorial Misconduct Regarding Withheld GPS-Related Discovery on Appeal

Murray argues that Attorney Behrens was ineffective on appeal because he did not challenge the government's alleged failure to disclose exculpatory GPS evidence. (Doc. 726-1 at 14–15.) Specifically, he contends the government intentionally failed to disclose "that DEA agents repeatedly installed GPS trackers on vehicles while parked on private property and within the curtilage of residences." (*Id.* at 14.) This "deception" by the government, Murray states, "denied the defense a fair opportunity to raise the issue in a motion to suppress" (*id.*) and violated Murray's due process rights (*id.* at 15). Murray concludes that "[t]his entire case hinged on GPS tracker evidence," and Behrens's failure to raise the alleged misconduct before the Second Circuit was prejudicial. (*Id.*)

36

Potential standing issues aside,[11] the government responds that Behrens was not ineffective for failing to advance this argument because the GPS installation did not implicate Murray's constitutional rights.  According to DEA Special Agent Rick Carter, who provided the only evidence about the location of the vehicles when the GPS devices were installed, Aguiar's vehicles were not "parked within the protected curtilage of the home" at the time.  (Doc. 749 at 24.)  Rather, as Agent Carter explained, the vehicles were located "in the parking lot to [Aguiar's] father's condominium" and "on a public street in Quincy, Massachusetts" when the GPS devices were installed.  (*Id.*)  The government argues that even if Behrens "had filed a motion to suppress on this ground, it would not have been successful."  (*Id.* at 25.)

Behrens agrees with the government that there was no evidence of misconduct with regard to the GPS device installation.  (Doc. 779 at 3, ¶ 10.)  He explains that "Williams raised the issue about the placement of the GPS devices during the first hearing on the motion to suppress," but that:

---

[11]  The government claimed that Murray did not have standing to challenge the GPS evidence before the Second Circuit.  That court explained:

> The government argues that Whitcomb and Murray cannot challenge their convictions based on the GPS data because they do not have standing to contest a search of Aguiar's vehicle.  The district court granted Murray and Whitcomb's motions to join the challenge of the use of the GPS tracker, noting that their motions to join in that challenge were unopposed.  Because we find the good-faith exception applies, we assume without deciding that Whitcomb and Murray have standing to press their challenge.

*Aguiar*, 737 F.3d at 256 n.3.  Under the same reasoning, I proceed with the analysis and do not address the standing issue, also raised in Behrens's Affidavit (Doc. 779 at 3, ¶ 10).

> [T]he trial evidence later established that the devices had been placed while
> Mr. Aguiar's car was parked in the parking lot of his father's residence or
> while Mr. Aguiar's car was parked on the street near his home in Quincy,
> Massachusetts.  Neither location is within the constitutionally protected
> curtilage of the home . . . .

(*Id.*)  He concludes that "there was no basis to file a motion to suppress."  (*Id.*)

"[T]he choice of which issues to raise on appeal is a matter of professional judgment left to appellate counsel."  *Parks v. Sheahan*, 104 F. Supp. 3d 271, 288 (E.D.N.Y. 2015) (citing *Jones v. Barnes*, 463 U.S. 745, 751 (1983)).  To prevail on an ineffective assistance of appellate counsel claim, "a petitioner must do more than simply demonstrate that counsel omitted a non[]frivolous argument, because appellate counsel is not required to raise all potentially colorable arguments."  *Carroll v. David*, No. 9:04-CV-0307, 2009 WL 666395, at *10 (N.D.N.Y. Mar. 11, 2009) (citing *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994)); *see also Santiago v. McGinnis*, No. Civ. 00–5870(LBS), 2002 WL 31946709, at *6 (E.D.N.Y. Oct. 21, 2002) ("This process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." (quoting *Smith*, 477 U.S. at 536)).  Moreover, the petitioner's mere disagreement with his attorney's strategy does not establish ineffective assistance.  *Alston v. Phillips*, 703 F. Supp. 2d 150, 179 (E.D.N.Y. 2010); *see also Barnes*, 463 U.S. at 754 (holding that to force counsel "to raise every 'colorable' claim suggested by a client would disserve the very goal of vigorous and effective advocacy").

Again, Murray's claim is identical to one raised by Aguiar in his § 2255 Motion, which has been rejected by this Court.  *See Aguiar*, No. 2:09-cr-90-1, ECF No. 767 at

68–71, *report and recommendation adopted, id.*, ECF No. 780.  Murray's assertion with respect to the GPS evidence fails here for the same reasons.  Both before the trial court and on appeal, Attorneys Williams and Behrens vigorously challenged the admission of the GPS evidence.  In his appellate brief filed in the Second Circuit, Behrens presented a cogent and detailed argument concerning the GPS data, including the "crucial role" this evidence played in Murray's arrest, as Murray stresses here.  Appellant Murray's Br. at 20–28, *Aguiar*, 737 F.3d 251, (No. 11–5262–cr(L)).  Murray demonstrates only that Behrens failed to argue *prosecutorial misconduct* specifically with regard to the GPS evidence on appeal.  This is merely a disagreement with Behrens's strategy, and not a cognizable ineffective assistance claim.  *See Alston*, 703 F. Supp. 2d at 179.  Moreover, Behrens has provided a detailed explanation underscoring why a prosecutorial misconduct claim concerning the GPS installation was baseless.  Therefore, Behrens's failure to raise this claim on appeal did not constitute ineffective assistance.[12]

### E.    Failure to Move to Suppress Three Title III Warrants Under *Franks* or the Necessity Requirement

#### 1.    *Franks*

Murray argues that Attorney Behrens should have moved to suppress the June 3, June 18, and July 2, 2009 Title III warrants under *Franks*, 438 U.S. 154.  (Doc. 726-1 at 15.)  He contends that Behrens "should have been aware that the supporting affidavits contained deliberate false statements, omissions, and reckless disregard for the truth,

---

[12]  I need not address Murray's due process or denial of a fair trial arguments, because Behrens did not perform deficiently.  (*See* Doc. 726-1 at 14; Doc. 753 at 7, 8.)

which were material to the finding of both necessity and probable cause." (*Id.* at 15–16.)

Those misrepresentations allegedly included "the number of targets," "the viability of

informants," and the role "GPS and other tracking technology" played in the

investigation. (*Id.* at 16.) The government responds that the *Franks* claim is simply

Murray's "attempt to relitigate the legality of the wiretaps," and that he "does not even

attempt to make" a showing that a *Franks* hearing was warranted. (Doc. 749 at 25.)

A *Franks* hearing allows a defendant to challenge the integrity of a warrant

affidavit in an effort to demonstrate that the warrant was not issued on the basis of

probable cause. 438 U.S. at 171–72. The defendant must "make[] a 'substantial

preliminary showing' that a deliberate falsehood or statement made with reckless

disregard for the truth was included in the warrant affidavit and the statement was

necessary to the judge's finding of probable cause." *United States v. Falso*, 544 F.3d

110, 125 (2d Cir. 2008) (quoting *Franks*, 438 U.S. at 155–56, 170–71). Mere factual

mistakes do not give rise to a *Franks* hearing. *United States v. Rajaratnam*, 719 F.3d

139, 146 (2d Cir. 2013). The Second Circuit also applies *Franks* to findings of necessity.

*See id.* "[T]he ultimate inquiry is whether, after putting aside erroneous information and

[correcting] material omissions, there remains a residue of independent and lawful

information sufficient to support [a finding of] probable cause [or necessity]." *Id.*

(second, third, and fourth alterations in original) (quoting *United States v. Canfield*, 212

F.3d 713, 718 (2d Cir. 2000)).

The Court has rejected an identical *Franks* claim by Aguiar with respect to

Attorney Williams. *Aguiar*, No. 2:09-cr-90-1, ECF No. 767 at 49–51, *report and*

*recommendation adopted, id.*, ECF No. 780.  Although counsel did not pursue a hearing

or challenge the three Title III warrants under a *Franks* theory, Behrens explains that "the

evidence in the case did not support such a motion."  (Doc. 779 at 2, ¶ 5), and that he did

not challenge evidence that Murray lacked standing to challenge (*id.* at 1, ¶ 1).  Again,

"strategic choices made after thorough investigation of law and facts relevant to plausible

options are virtually unchallengeable."  *DeLuca*, 77 F.3d at 588 (quoting *Strickland*, 466

U.S. at 690).  More importantly, Murray fails to show that the affiant, Agent Couture,

made deliberate falsehoods in the warrant affidavits.  Behrens cannot be faulted for

failing to raise a meritless *Franks* claim and accordingly, I conclude that he was not

ineffective at trial or on appeal on this basis.[13]

### 2.    Necessity

Lastly, Murray faults Behrens for failing to challenge whether the affidavits

demonstrated that the wiretaps were necessary under 18 U.S.C. § 2518(1)(c).[14]  (Doc.

726-1 at 16.)  The record reveals that Behrens raised the necessity issue, including at the

August 4, 2010 suppression hearing.  (*See* Docs. 180, 624.)  Behrens points out that he

---

[13]  Murray again requests that the Court supplement his own Motion with the arguments set forth in Aguiar's § 2255 Motion.  (*See* Doc. 726-1 at 16 n.1; Doc. 753 at 9.)  As noted above, the Court denied Murray's prior Motion to Join Aguiar's § 2255 claims (*see* Docs. 738, 744), and Aguiar's § 2255 motion has since been denied by the Court in its entirety (Doc. 780).  Therefore, I do not consider Aguiar's arguments here.

[14]  While Murray's argument appears to be based on the 18 U.S.C. § 2518(1)(c) necessity requirement, he also may be alluding to the "particularity" requirement for warrants.  The particularity requirement is intended to prohibit warrants that are "vague and open-ended," or "boilerplate."  *See United States v. Cohan*, 628 F. Supp. 2d 355, 361 (E.D.N.Y. 2009).  Though Murray mentions the word "particularity," his reference to "accurate[]" descriptions in the affidavits demonstrate that he is concerned primarily with purported misrepresentations and false statements, not vagueness.

argued the necessity issue in his Motion to Suppress evidence from the July 2 wiretap application (Doc. 180), and as for "the other wiretaps and necessity, [he] joined in all motions filed by Aguiar." (Doc. 779 at 2, ¶ 4.)

Title III wiretap applications must be supported by a showing of "necessity" under 18 U.S.C. § 2518(1)(c). That is, "each application for a wiretap [must] include . . . 'a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" *United States v. Levy*, No. 1:(S5) 11 Cr. 62(PAC), 2012 WL 5830631, at *3 (S.D.N.Y. Nov. 16, 2012), *aff'd*, 626 F. App'x 319 (2d Cir. 2015) (quoting 18 U.S.C. § 2518(1)(c)). "This 'necessity' requirement 'is designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" *Id.* (quoting *United States v. Serrano*, 450 F. Supp. 2d 227, 236 (S.D.N.Y. 2006)).

The Court determined that Attorney Williams provided Aguiar reasonable assistance in challenging the Title III wiretap applications. *Aguiar*, No. 2:09-cr-90-1, ECF No. 767 at 45–48, *report and recommendation adopted, id.*, ECF No. 780. Behrens's performance, including joining in Williams's extensive efforts to suppress the Title III evidence, also fell within the wide range of professional competence under *Strickland*'s performance prong. Behrens argued a necessity issue in his Motion to Suppress the evidence from the July 2, 2009 warrant. (Doc. 180 at 4–6.) Williams also argued, in a Motion to Suppress joined by Murray (*see id.* at 1), for suppression of all wiretap evidence on the basis that the "Title III warrants d[id] not adequately explain why

normal and less intrusive investigative methods would fail [to] uncover evidence . . . ."
*Aguiar*, No. 2:09-cr-90-1, ECF No. 171 at 6.  Williams pressed the necessity issue at the
August 4, 2010 motions hearing, during which Behrens joined "in everything" that
Williams said.  (Doc. 624 at 18–22, 29, 55–76.)  In response, the government called
Agent Couture, who testified about the investigative techniques used in the
investigation—including "undercover agents" (*id.* at 57), "confidential sources" (*id.* at
58), "[l]ive and GPS surveillance" (*id.* at 58–59), and "one financial subpoena" (*id.* at
60).  The agent detailed the limitations of those techniques (*id.* at 56–63), and explained
why certain methods were not used during the investigation, including "search warrants"
(*id.* at 59–60) and jail informants (*id.* at 61), because of the risk of "tipp[ing]" off the
criminal enterprise and safety concerns.  Williams cross-examined Agent Couture about
the wiretap applications (*id.* at 63, 67) and why specific investigative tactics had not been
pursued (*id.* at 67, 68, 70).  Behrens also cross-examined Agent Couture, focusing on the
affidavit that supported the July 2 warrant application, and questioning the sources of
information used in the investigation.  (*Id.* at 70–73.)  The Court held that "the
Government satisfied the necessity requirement."  (Doc. 371 at 14.)

      It is abundantly clear that Behrens provided reasonable and effective assistance by
repeatedly advancing a necessity argument and thoroughly scrutinizing law enforcement
efforts to first pursue normal investigative techniques before utilizing a wiretap.  (*See*
Doc. 624 at 63–76 (suppression hearing, cross-examinations).)  To the extent Murray is
asserting that Behrens should have argued the necessity issue differently (*see* Doc. 753
at 8 ("Behrens advanced an obviously losing argument . . . rather than an obviously

meritorious one by failing to instead raise his own motion.")), this is not a cognizable ineffective assistance of counsel argument.  *See, e.g.*, *Savinon v. Mazucca*, 318 F. App'x 41, 44 (2d Cir. 2009) ("An attorney who makes a strategic choice that is not persuasive to a court does not render constitutionally ineffective assistance simply because, with the benefit of time and hindsight, other strategies can be identified that might have been successful.").  Also, contrary to Murray's assertion (*see* Doc. 753 at 8), Behrens *did* file a suppression motion on Murray's behalf.  Accordingly, Murray's claim of ineffective assistance due to Behrens's failure to argue necessity is meritless.

## II.    **Evidentiary Hearing**

It appears that Murray is requesting a hearing on his Motion.  (Doc. 753 at 2.) When ruling on a § 2255 motion, the district court is required to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255; *see also Pham v. United States*, 317 F.3d 178, 185 (2d Cir. 2003) (stating that § 2255 does not permit summary dismissals of motions that present facially valid claims).  The defendant's motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle him to relief.  *See Machibroda v. United States*, 368 U.S. 487, 494 (1962); *United States v. Aiello*, 814 F.2d 109, 113–14 (2d Cir. 1987). However, § 2255 does not entitle the defendant to a hearing where his allegations are "vague, conclusory, or palpably incredible."  *Machibroda*, 368 U.S. at 495; *see also Chang v. United States*, 250 F.3d 79, 85 (2d Cir. 2001).  Murray's § 2255 Motion does

not raise specific facts supported by competent evidence that would entitle him to relief if proved at an evidentiary hearing.  Accordingly, no hearing is required.

### III.    Motion to Strike Affidavit

Murray also moves to strike Behrens's Affidavit, arguing that Behrens did not properly certify the Affidavit under 28 U.S.C. § 1746, did not serve a copy of the Affidavit on Murray, and that the Affidavit allegedly contains "misstatements."  (Doc. 777 at 1.)

Absent unusual circumstances, defense attorneys should be given the opportunity to respond to claims of their ineffectiveness, such as in an affidavit.  *See, e.g.*, *Bloomer v. United States*, 162 F.3d 187, 194 (2d Cir. 1998).  While "[t]he court may strike from a *pleading* . . . any redundant, immaterial, impertinent, or scandalous matter," Fed. R. Civ. P. 12(f) (emphasis added), "[m]otions, declarations[,] and affidavits are not pleadings." *Granger v. Gill Abstract Corp.*, 566 F. Supp. 2d 323, 335 (S.D.N.Y. 2008); *see also United States v. Zullo*, Crim. Action No. 1:09–cr–64–2, 2015 WL 12670504, at *1 (D. Vt. Apr. 10, 2015) (same); Fed. R. Civ. P. 7(a) (defining pleading as the complaint, including a third party complaint, answer, including an answer to a counterclaim or crossclaim, and a reply to an answer if ordered by the court).

Behrens's Affidavit was filed at the direction of the Court and there is no basis to strike it from the record.  Furthermore, Murray's claims about the Affidavit's deficiencies are moot and meritless.  In order to be treated as sworn under 28 U.S.C. § 1746, an affidavit must contain the language "under penalty of perjury."  28 U.S.C. § 1746; *see also In re World Trade Ctr. Disaster Site Litig.*, 722 F.3d 483, 488 (2d Cir. 2013).

Murray argues that Behrens's Affidavit was not properly sworn or served on him.  (Doc. 777 at 1.)  But these claims are now moot.  Pursuant to an Order by the Court (Doc. 778), Behrens filed an amended Affidavit (Doc. 779) properly certified with the required language under 28 U.S.C. § 1746, which was served on Murray.

Additionally, Murray does not cite to any authority for his claim that Behrens's alleged "misstatements" cannot be considered by the Court.  At most, it appears that Murray simply disagrees with Behrens's account of events and the Court need not accept this assertion.  *See Al Kassar v. United States*, Nos. 13 Civ. 3541(JSR)(JLC), 07 Cr. 354(JSR), 2014 WL 1378772, at *10 (S.D.N.Y. Apr. 8, 2014) (listing cases in which courts credit "credible" attorney affirmations over "self-serving allegations" by defendant (quoting *Castrillo v. Breslin*, No. 01 Civ.11284 GBD GWG, 2005 WL 2792399, at *14 (S.D.N.Y. Oct. 26, 2005))).  Moreover, the Court has already addressed and rejected the substance of these alleged "misstatements"—reiterations of Murray's claims from his § 2255 Motion—in the discussion above.  Accordingly, Murray's Motion to Strike (Doc. 777) is DENIED as both moot and meritless.

## Conclusion

For the reasons stated above, Murray's Motion for Joinder (Doc. 762) and Motion to Strike the Affidavit of Attorney Behrens (Doc. 777) are DENIED.  Additionally, I recommend that the Court DENY Murray's Motion to Vacate (Doc. 726).

A certificate of appealability in a § 2255 proceeding may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Under this standard, a certificate of appealability will not issue

unless reasonable jurists could debate whether the petition should have been resolved in a

different manner, or the issues are "adequate to deserve encouragement to proceed

further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation omitted). The District

Court Judge held that Aguiar did not satisfy this standard, *Aguiar*, 2:09-cr-90-1, ECF No.

780 at 4, and Murray similarly fails to do so here. Accordingly, I further recommend that

a certificate of appealability be DENIED.

Dated at Burlington, in the District of Vermont, this 20th day of March, 2017.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within 14 days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).